## Richmond.

HUMPHREYS v. R. & M. R. R. COMPANY.

December 3rd, 1891.

1. DEED—*Conditional delivery—Parol evidence.*—Parol evidence is admissible to show that an agreement was delivered to obligee or grantee to take effect only upon the happening of a condition which is shown never to have happened. *Nash* v. *Fugate,* 32 Gratt. 595.

2. IDEM—*Case at bar.*—An agreement to grant right of way for a railroad which has been shown by parol evidence to have been delivered to the president of the road, on condition that it should not take effect unless it was necessary to the building of the road, or unless the board of directors should make compensation therefor. After road was completed, though no necessity had occurred for using the right of way, and though no compensation had been made therefor, the president turned the agreement over to the right-of-way agent, who was aware of said conditions;

HELD:

> The agreement was void, and plaintiff entitled to an issue of *quantum damnificatus* to ascertain the damages to his land.

Appeal from decree of circuit court of Mecklenburg county, rendered April 15th, 1889, in the suit in chancery wherein T. F. Humphreys was complainant, and the appellant, the Richmond and Mecklenburg Railroad Company, was defendant. The object of the suit was to enjoin the prosecution of an action at law by said company against said Humphreys to recover the amount of his subscription to its capital stock, and to annul a certain agreement to give a right of way through his land, and to set off the damages done thereto against the

amount due on said subscription.   The decree appealed from dissolved the injunction and dismissed the bill.   Opinion states the case.

*W. W. Henry* and *Finch & Atkins*, for appellant.

*T. N. Williams* and *B. B. Munford*, for appellee.

RICHARDSON, J., delivered the opinion of the court.

The case, briefly outlined is as follows :   In the year 1863, T. F. Humphrey purchased a tract of land in the county of Mecklenburg, on Roanoke river, near the town of Clarksville, of one Joseph G. Snead.   Subsequent to this purchase, in a suit brought to enforce a prior lien, the same land was sold on the 5th of July, 1870, under a decree of court, and was bought in by said Humphrey's, and he thereby became the owner in fee of said land.

Prior to the purchase by Humphreys, to-wit, in the year 1860, the Roanoke Valley Railroad Company had entered upon said land without taking the steps required by law for the purpose, and without any title to same had erected thereon earth-works and masonry for the purposes of its railway; and in the construction of said earth-works and masonry took, or occupied and seriously damaged several acres of valuable river-bottom land belonging to said tract.

The Roanoke Valley Railroad Company became insolvent and did not complete any part of its proposed line of railway, and sometime in the year 1880, the Richmond and Mecklenburg Railroad Company became the owner of the property, rights and franchises of said Roanoke Valley Railroad Company.   Thereupon the Richmond and Mecklenburg Railroad Company entered into an agreement with the Richmond and West Point Railway and Warehouse Company, through the Richmond and Danville Railroad Company, which controlled said Richmond

and West Point Railway and Warehouse Company, to build
the proposed Richmond and Mecklenburg Railroad from
Clarksville to Keysville, in the county of Charlotte, and a
point on the Richmond and Danville Railroad, for a certain
amount of the first mortgage bonds of the Richmond and
Mecklenburg Railroad Company, but upon the following con-
ditions:

" I. That the Richmond and Mecklenburg Railroad Com-
pany should acquire a perfect title to all the franchises, property,
rights of way and road-bed of the old Roanoke Valley Rail-
road Company, the same having been mortgaged and in the
hands of trustees, the same to be purchased from said trustees
for $300,000, payable in the paid-up capital stock of the Rich-
mond and Mecklenburg Railroad Company.

II. That the said trustees should transfer and assign to the
said Terminal and Warehouse Company the said $300,000 of
paid-up stock of the Richmond and Mecklenburg Railroad
Company."

This arrangement having been effected, and the conditions
aforesaid complied with, thereupon P. F. Howard was em-
ployed by the Richmond and Mecklenburg Railroad Company
to acquire for it the rights of way along the line of the pro-
posed road. In furtherance of that object he and John B.
McPhail, the president of the Richmond and Mecklenburg
Railroad Company, approached T. F. Humphreys and
requested him to donate the right of way through his said land,
but Humphreys declined to do so, saying he had already sub-
scribed $1,000 to the capital stock of said company, which was
as much as he was able to give it. It seems, however, to have
been thought by McPhail that the refusal of Humphreys to
donate the right of way through his land, if known, would be
injurious to the scheme for securing the donation of the right
of way from others along the line. He, therefore, called on
Humphreys again, and proposed a special arrangement. Land-
owners along the line having been asked to sign a general

paper binding them, respectively, to donate the right of way through their lands, Humphreys was asked to sign a separate paper of similar import, which was to be held by McPhail and not to be delivered to the railroad company, unless compensation was allowed him, or the construction of the road would be prevented by withholding such paper; and McPhail, insisting that the demand for compensation might endanger the building of the road, Humphreys signed and delivered to McPhail the paper, to be held by him subject to the conditions aforesaid. But, after securing said paper, under such circumstances, without securing compensation to Humphreys or making any effort to do so, although the company had ample assets out of which to make the compensation, McPhail, long after the building of said road was assured, delivered the paper so executed by Humphreys to said P. F. Howard, the regularly employed agent of said Richmond and Mecklenburg Railroad Company, to acquire for it the rights of way along the line of its road, and who was present when said paper was executed and delivered by Humphreys to McPhail, and was fully cognizant of the condition aforesaid upon which it was executed and delivered.

Subsequently, and prior to the institution of the present suit, the Richmond and Mecklenburg Railroad Company brought an action at law in the circuit court of Mecklenburg county against said T. F. Humphreys, the object of which was to collect from him $700, the balance claimed to be due on his said subscription of $1,000; and, at the October term, 1885, of said court, with the leave of court, said Humphreys filed his bill against said Richmond and Mecklenburg Railroad Company, setting forth substantially the facts above stated, and praying for an injunction to restrain said railroad company from proceeding in said action at law until the further order of the court; that said paper of October 3d, 1881, be declared null and void; that the damages to the plaintiff's land be set off against his said subscription, and that the

defendant company be required to answer, but waiving answer under oath, and for general relief. A temporary injunction was accordingly awarded the plaintiff, but on condition of his confessing judgment in said action at law for the said balance due on said subscription, which was done.

The Richmond and Mecklenburg Railroad Company answered the plaintiff's bill, and claimed that while it may be true, as alleged, that the Roanoke Valley Railroad Company entered upon the lands in question about the year 1860, without any authority, and while it may be true that said corporation had no title to said right of way, yet insists that the plaintiff is estopped from raising a question of title as to that corporation for the reason that about October, 1881, by a certain paper, he gave the unconditional right of way through his low-grounds to Major John B. McPhail, then and now president of the Richmond and Mecklenburg Railroad Company, and with its answer exhibited said paper, or a copy thereof, marked "A." And the said company, in its answer, denies that it ever entered upon the lands of the plaintiff without his permission and in disregard of his rights; but says "that the authority under the paper writing referred to was complete, and which authority was never questioned by the plaintiff, although it was a long time after the paper was executed by him and delivered to Major John B. McPhail, before respondent began to work on that part of the right of way given by said paper, which intervening time afforded every opportunity for the plaintiff to make any demand he thought proper for compensation, or to object to a continuance of work, and yet said complainant never in any way objected to the work, or said one thing about pay, which respondent submits is very strange upon his part, if, under said paper, he was entitled to it."

The defendant company denies having ever injured the lands of complainant, but say that said land, if injured, was injured long before by the same embankment placed there by another railroad company, and that even if the lands have been injured, it is by no fault of respondent, &c.

Such is the answer, omitting its merely argumentative features, except that it concludes with a prayer that the injunction awarded the plaintiff be dissolved, and that he be required to specifically perform his agreement to convey the said right of way to respondent, &c.

Depositions were taken by both parties, and on the 15th day of April, 1889, the cause came on to be heard, when a decree was rendered dissolving the injunction theretofore awarded in the cause, and dismissing the plaintiff's bill; and from that decree the case is here on appeal.

The case presented for our determination turns upon the legal effect of paper " A," executed on the 3d day of October, 1881, by the appellant, T. F. Humphreys, and delivered to John B. McPhail, to be delivered by him to the Richmond and Mecklenburg Railroad Company, upon certain conditions, which paper is as follows:

" In consideration of the advantage to be derived from the construction of the Richmond and Mecklenburg Railroad, I promise and bind myself that I will, when thereto requested by the president of the Richmond and Mecklenburg Railroad Company, or such person as may be authorized by him to make the request, grant and convey to the said company so much of my land as will be sufficient for the construction and convenient use of said railroad through my tract of land, not exceeding the width limited by the law of Virginia in case of condemnation of lands for railroads; such grant to be with condition that in using such land for the railroad, cattle-guards shall be provided where fences cross, if there be any such places, and also the necessary road crossings over the railroad.

" Given under my hand and seal this 3d day of October, 1881.

" The words ' so much of my land,' at the beginning of the seventh line above, interlined before signing.

(Signed)    " T. F. HUMPHREYS, [*Seal.*]

" Signed, seal, and delivered in person of—

     (Signed) " J. B. McPHAIL, JR.
     (Signed) " P. F. HOWARD."

On the part of the appellant, Humphreys, it is contended that this paper was signed by him, and delivered to McPhail, upon the express condition, orally agreed upon, and understood between them before said paper was signed, that it should be held by McPhail, and not delivered or used until the directory of the Richmond and Mecklenburg Railroad Company should allow Humphreys compensation for the right of way through his land, unless the withholding of said paper would defeat or imperil the building of the proposed railroad, McPhail agreeing and undertaking, as the agent of Humphreys, to present his claim for compensation to said directory, and to endeavor to secure its allowance, the amount of which was left to the discretion of McPhail.

On the other hand, the appellee, the Richmond and Mecklenburg Railroad Company, insist that the paper, on its face, expresses all that was agreed upon and understood between Humphreys and McPhail; that its terms are absolute and unconditional, and that the paper was not signed by Humphreys and delivered to McPhail upon the condition alleged, or upon any condition other than what is expressed on the face of the paper itself, and that the appellant, Humphreys, is bound thereby.

The parties being thus at issue, we must first find whether the fact is as alleged by the appellant, and second, if so, whether or not such fact may be established by parol evidence, notwithstanding the unconditional character of the paper on its face. The question of fact must be determined by the evidence. Aside from papers " A " relied on by the appellee, the only material evidence introduced on behalf of the railroad company is found in the deposition of Jno. B. McPhail, who was

then and is yet the president of the Richmond and Mecklenburg Railroad Company.    Contrary to the usual order of procedure, McPhail was the first witness whose deposition was taken in the cause.    The only material evidence introduced on behalf of the appellant, Humphreys, is found in the deposition of McPhail himself, and in the deposition of W. W. Wood, who was at the time of the execution of paper " A " the general counsel of the Richmond and Mecklenburg Railroad Company, and in the depositions of F. J. Tupfort and of the appellant, T. F. Humphreys.    These depositions will be referred to in the order named; but it is not necessary to. enter into a critical analysis of all that is said in them, much of which is either useless repetition or is matter wholly immaterial.

Omitting all needless repetition, and all irrelevant and immaterial matter, Jno. B. McPhail deposes substantially as follows : That he was president of the Richmond and Mecklenburg Railroad Company, in October, 1881, when paper " A " was signed by Humphreys and delivered to him, by which Humphreys obligated himself to convey to said railroad company the right of way through his land when requested to do so by said company, that P. F. Howard was, at the time, accompanying him along the line of road for the purpose of writing agreements securing to the company rights of way, and that said Howard was, he thinks, present when paper " A " was signed by Humphreys and delivered to witness; that the Richmond and Mecklenburg Railroad was built by contract with the Richmond and West Point Terminal Company, and that by the arrangement between the Richmond and Mecklenburg Company and the Richmond and West Point Terminal Company, one of the conditions imposed by the latter upon the former was, that before it would enter into any contract to build the road, the former should acquire title to the right of way and turn the same over to the Richmond and West Point Terminal Company, and that this condition was embodied in a proposition submitted by the president (McPhail) of the

Richmond and Mecklenburg Railroad Company, to the trustees holding the franchises, right of way and property of the old Roanoke Valley Railroad Company for the county of Mecklenburg, and to such private individuals through whose lands the line of road was located, and who had not conveyed the right of way to the Richmond and Mecklenburg Company, and in answer to a question, the witness further says: "I have a memorandum which I read to the trustees in submitting the proposition referred to, which is marked 1, 2, 3, and filed by the witness as part of his deposition. The last question asked McPhail on his examination in chief was this: "Did you, or did you not, agree as an officer or agent of the Richmond and Mecklenburg Railroad, to pay Mr. T. F. Humphreys for the right of way through his low-grounds above referred to?" He answers: "I did not." It may here be observed that this question and answer is not responsive to, but evades the issue joined between the parties. The allegation in the appellant's bill is not that McPhail, as an officer or agent of the Richmond and Mecklenburg Railroad Company, agreed to pay the appellant, Humphreys, for the right of way in question, but that he as the agent of Humphreys, agreed and undertook to present his claim to compensation for the right of way to the board of directors of said company, and to urge its allowance, but that he failed to perform his agreement and undertaking, and in violation of the conditions upon which paper " A " was signed by the appellant and delivered to him, he, when neither of the conditions had happened and long after the building of the road was assured, delivered said paper to the railroad company when he should have returned it to the appellant, Humphreys.

McPhail was subjected to a very long and searching cross-examination; then to long re-examination and re-cross-examination, and finally was subjected, in effect, to a cross-examination by the counsel of the railroad company, in behalf of which he was introduced as a witness. The substance of this cross-examination, so far as relevant and material, is substan-

tially as follows: In answer to the first question propounded to him: "When you first approached T. F. Humphreys to secure the right of way through his low-grounds for the Richmond and Mecklenburg Railroad, did he not decline very promptly to give the same?" McPhail answered: "My recollection is that Mr. Humphreys hesitated, and urged that he should have some compensation for the right of way through his lands." He was then asked whether he secured paper "A" at the first interview he had with Humphreys, and he answered that he did not remember. Being asked, "Did you not, in securing the right of way for the Richmond and Mecklenburg Railroad, use a paper with a heading obligating the signers to said paper to give the right of way to said road, and which paper was generally used for that purpose?" McPhail answered: "The papers relating to the right of way were drawn by P. F. Howard, who was employed by the company for that purpose. Some years having elapsed, I do not remember the exact form used. I do not remember whether there was a paper for general signature. I know that single papers were used in many cases."

Being then asked to state as many instances where single papers were used as he could remember, he answered that he could not remember any particular number, and being asked to name a single instance, he failed to recall even one; but said he was unable to give names without refreshing his memory by the record. He was then asked how, not being able to remember a single instance, he was able to swear that in many instances single papers were used, and he answered that he had stated to the best of his knowledge and belief that many single papers were used, and that he could remember transactions without being able to remember the names of parties. But he added: "I am entirely confident that the right of way papers will sustain my recollection that single papers were used in numbers of cases." Now, however true all this may be, still the fact stands boldly out that McPhail did not

resort to the records to verify the correctness of his statement; nor does he satisfactorily explain why he so confidently remembered that in many cases single papers were used, when he could only recall one single instance, and could not remember the person with whom the transaction was had, and yet failed to remember that when he first approached the appellant, Humphreys, he presented to him the paper for general signature, which he refused to sign, and refused to give the right of way through his land without just compensation. These matters under other circumstances would amount to little or nothing, but they become important in view of the fact that the appellant, Humphreys, whose deposition is in the record, among other things, testifies positively that McPhail first approached him with the paper for general signature and solicited his signature thereto, but that he positively refused to sign it, or to donate the right of way, giving as a reason for his refusal that he had already subscribed $1,000 to the capital stock of the company, which was as much, if not more, than he was able to give, and that if the company needed any more of his property he was entitled to and demanded just compensation therefor. The appellant, Humphreys, made substantially the same statement to W. W. Wood and F. J. Tupfort, as appears from their depositions.

In the course of this cross-examination, McPhail was asked this question :

"Have you no recollection of any reason assigned by Mr. Humphreys, on your first interview with him, why he declined to give paper ' A ? ' "

Answer. " I do not remember that Mr. Humphreys, at any time, positively declined to give the right of way, but I do remember that he hesitated and urged that he should have some compensation."

Now, this is a singular statement, especially in view of the facts disclosed in the depositions of W. W. Wood, the then general counsel of the Richmond and Mecklenburg Railroad

Company, and who had repeated conferences with McPhail, the president of said company, with respect to the refusal of Humphreys to give the right of way through his land, and of F. J. Tupfort, both of whom testify positively that McPhail told them that Humphreys *had refused* to give the right of way, and urged and induced them, as friends of Humphreys, to see him and use their influence to induce him to recede from the position he had taken, and at the same time urged them to be quiet and to say nothing about it, as it might influence others who had promised to give the right of way through their lands. They both did call on the same day, though not at the same time—Wood calling once and Tupfort twice—and to each of them Humphreys gave his reasons for refusing to give the right of way when solicited to do so by McPhail, and to each of them he positively refused to recede from his position, and earnestly insisted upon just compensation for the right of way through his land. Tupfort's first visit to Humphreys was in the forenoon; his second in the afternoon of the same day, when he, in company with McPhail himself, went into the back room of Humphreys' store, where they found P. F. Howard and Humphreys engaged in discussing the matter of the right of way. On this second visit of Tupfort he took no part in the discussion, but stood by and listened to the discussion between Humphreys on the one hand and McPhail and Howard on the other; and Tupfort says that Humphreys still firmly refused to donate the right of way, and demanded compensation therefor.

In the light of the direct and positive testimony of these two witnesses, it is passing strange that McPhail should say, as he did, that he did not remember that Mr. Humphreys, at any time, positively declined to give the right of way. Moreover, as to what transpired from the time McPhail first approached Humphreys and urged him to donate the right of way until the execution of paper " A," Humphreys himself testifies as follows:

" As the work progressed upon the road, before the completion to Clarksville, when sitting at my place of business, two gentlemen entered, one of whom was Major McPhail; the other, a stranger to me, who was introduced by Major McPhail as Mr. Howard, agent of Richmond and Mecklenburg Railroad to secure the right of way to lands through which it passed, and requesting me to give the right of way through my land. Knowing that it would require some time to explain to Major McPhail my position with regard to the matter, I invited him into the rear of my store to be seated, that I might set forth the facts. I then stated to him that I declined to give the right of way; that I had already subscribed my full share, and all that I felt able to subscribe; and that I thought if the railroad company required any other property that I had, they ought to pay me its value. In the same conversation I stated to him that I had taken a similar position a few years before, when applied to by the Southern Security Company for right of way. The Major seemed much surprised and disappointed, and earnestly urged that I should recede from my position. I was firm, and stated to him that, when taking a similar position with the Southern Security Company, I had stated the facts to a mutual friend, whose name I gave, who fully approved of the position I took. I also think I stated that I would derive neither profit, honor, or thanks for making a donation to the corporation. Major McPhail urged that the effects would be bad, expressed his regrets, and left with Mr. Howard, evidently discomfitted. The next day parties came to me and expressed surprise at what they had heard about my declining to give the right of way, and respecting some fabulous stories as to charges that I had proposed to make for the right of way. Later in the day Major McPhail again came in, and wished to know if I had reconsidered the matter. I told him I had thought over it, but saw no reason to change my position, and again repeated the arguments used on the previous day. The Major then suggested that he had devised a plan which he thought would

meet the case. He then suggested that, as I refused to sign the general paper for relinquishment of lands, he would prepare a special paper for my case, and put it in his pocket and present it to the board, and he thought he might be able to get me compensation ; at the same time alleging that the not granting the right of way might imperil the building of the road, and alluded to my being especially friendly to the road, and so looked upon by the community. I promptly met that by stating that nothing that I should ever do should ever imperil the building of the road, and at once acquiesced in the proposition to give a separate right of way, with the proviso that it was not to be. used unless the non-use of it obstructed the building of the road, or a directory made me an allowance for the right of way. That seemed to be satisfactory to the Major. He then left, stating that he would prepare, or have prepared, the paper. A few days after he came in with Mr. Howard and produced the proposed paper for signature, which I promptly signed without any further conversation as to the conditions. Many months elapsed, and I heard nothing further from it. Finally, the Major, meeting me on the street, remarked to me that he had not yet presented the paper. After several months more we met again, and he then stated to me that he had presented that paper, and that the board .refused to make any allowance. I promptly remarked : ' Well, you know, Major, the conditions upon which that paper was given.' He did not seem fully to comprehend my meaning, and I repeated what I understood to be the understanding that the paper was not to be used unless the non-use of it obstructed the building of the road, or the board made me an allowance for the right of way. I also stated : ' If you will say, Major, that the non-use of that paper would have stopped the building of the road, I have nothing more to say.' He promptly stated : ' I will say that if you and others had withheld the right of way, it would have obstructed the building of the road.' I stated that was not what I said.''

Having made this full and clear circumstantial statement,

which is natural and consistent in all its parts, and is fully corroborated, in its most important features, by the testimony of W. W. Wood, and F. J. Tupfort, Humphreys is asked this question:

"Is your memory clear and distinct upon the conditions on which you signed the paper 'A'?"

Answer. "Perfectly so; as much so as any event in my past life, having thought of it hundreds of times, and feeling at the same time that all that I risked in acceding to the Major's proposition was that the directory might have made me a pitifully small allowance for the right of way."

The appellant, Humphreys, was further examined in chief as follows:

Question. "Was it your understanding that you would be bound by the paper given by you to Major McPhail if the directory did not allow you a satisfactory compensation?"

Answer. "It was my understanding that Major McPhail had the right to exercise his discretion in turning the paper over, however small the compensation provided. He believed that the mere use of that paper would have prevented the building of the road. At the time the paper was given the building of the road had progressed so far that I felt that I incurred no risk with that proviso attached, except in the smallness of the allowance that might be made for the right of way, feeling that if they made no allowance the proviso came in and nullified it."

Question. "In your previous answer you have stated that when Major McPhail informed you, you promptly remarked: 'Well, you know, major, the conditions upon which that paper was given,' and that you repeated to him what you understood to be the understanding with which that paper was executed—to-wit: that that paper was not to be used unless the non-use of it obstructed the building of the road, or the board would make you an allowance for the right of way. When you told him this did he deny that these were the conditions upon which the paper was executed?"

Answer. " He did not, but asserted that he would say that if others had done the same thing it would have obstructed the building of the road. I regarded that as an evasion, and we had no further conversation on the subject."

Now, recurring briefly to the deposition of McPhail, we find in his cross-examination the following :

Question. " Have you no recollection of saying to Mr. Humphreys that if he would sign paper 'A,' you would go before your board of directors and get them to allow him compensation for the right of way through his low-grounds, or something to that amount ? "

Answer. " No, sir. I never at any time gave Mr. Humphreys the least encouragement that I could get him compensation. The Richmond and Mecklenburg Railroad Company had agreed to acquire title to right of way, and was incompetent to make any such concession without the consent of the Terminal Company, to which it was under obligations to acquire the right of way. On the contrary, Mr. Humphreys gave the right of way, with the request that I would use my best endeavor to get him some compensation, but named no particular amount. An agreement requiring compensation would have been of no conceivable value, such terms being already provided by law, referring to condemnation of lands for such purposes. I would not have held the paper upon condition that I was to get compensation. It was distinctly understood that I should pass the paper to the company if I could not get compensation, and that the matter of compensation should not be pressed to the hazard of building the road."

Now observe that McPhail, after returning a plain negative answer to a very simple question, goes on to say that he never at any time gave Humphreys any encouragement as to securing compensation for him, then enters upon the absurd statement that inasmuch as the Richmond and Mecklenburg company, by its arrangement with the Terminal company, had bound itself to secure the right of way, it was, therefore, not

competent for that company to do what it had bound itself to the Terminal company to do. But in the last sentence of the answer above, McPhail practically admits all that is claimed by Humphreys when he says : " It was distinctly understood that I should pass the paper to the company, if I could not get compensation, and that the matter of compensation should not be pressed to the hazard of building the road." And again :

Question. " Did this question of compensation by your board arise at the first interview with Mr. Humphreys ? "

Answer. " Yes, sir. Mr. Humphreys withholding right of way for compensation was the first suggestion that crossed my mind in regard to compensation in his case."

Question. " In answer to question 28, you say that Mr. Humphreys stated to you that he would sign the paper with the. understanding that you would try to get him compensation. Now, was this said to you at the first or at a subsequent interview with him ? "

Answer. " As that seems to be the end of the transaction, it must have been at the last interview or conclusion of the negotiation."

Question. " Did you ever try to get compensation for Mr. Humphreys; and, if so, when and from whom, and what was the result of your effort ? "

Answer. " Yes, sir. Our only appeal in the matter was to the Terminal company, the Richmond and Mecklenburg Railroad Company being utterly destitute of means, except such as had already been contracted to be expended in the construction of the road. I repeatedly made efforts to get money to purchase right of way. Matters were then very shaky, the Terminal company showed no eagerness to complete the work, and any faltering on our part as to the condition imposed on us, I feared, would be fatal. I dared not press them harder than I did to do that which we had agreed to do ourselves. I did all that could have been expected or desired by Mr. Hum-

phreys, or that I would have desired or expected from Mr. Humphreys had our positions been changed."

Now, in his answer to the last two questions, as above set forth, McPhail, notwithstanding his previous statements to the contrary, makes two things certain: First. That Humphreys did withhold the right of way through his lands for compensation; or, in other words, that he did refuse to give the right of way without compensation. Second. That notwithstanding his admission that the distinct agreement was that he was to try to get Humphreys compensation, he admits that he never made any effort to do so. He was to make application for the allowance of compensation to his board—the board of directors of the Richmond and Mecklenburg Railroad Company, of which he was the president—but he admits that the only application ever made was to the Terminal Company, a company that was confessedly under no obligation, either to the Richmond and Mecklenburg Company or to Humphreys, to pay for rights of way either to Humphreys or any one else, and a company with which Humphreys had no concern whatever.

And as to the statement of McPhail, that the Richmond and Mecklenburg Company was utterly without means, except such as had already been pledged to the construction of its road, it is not only not borne out by the record, but the contrary clearly appears.

As already stated, the Terminal Company agreed with the Richmond and Mecklenburg Company to construct the road of the latter company upon two conditions: First. That the Richmond and Mecklenburg Company should acquire a perfect title to all the franchises, property, rights of way, and road-bed of the old Roanoke Valley Railroad Company, then held by trustees for the county of Mecklenburg, by purchasing the same from them for $300,000, payable in the paid-up capital stock of the Richmond and Mecklenburg Railroad Company. Second. That said trustees should transfer and assign the said $300,000 of stock to the construction company. Both of these

conditions were performed; but it will be seen that they did not involve the acquisition by gift of the right of way and road-bed through the land of Humphreys or any one else. On the contrary, inasmuch as the old Roanoke Valley Company had never acquired the right of way through the land of Humphreys, the Richmond and Mecklenburg Railroad Company was not only left free to purchase out of their assets such rights of way and road-bed, but actually bound itself to the Terminal Company to do so. And having performed the conditions aforesaid, the Richmond and Mecklenburg Company, on the 27th day of October, 1881, consummated its agreement with said Terminal Company, whereby the said Terminal or Construction Company agreed to build the Richmond and Mecklenburg Railroad for the sum of $400,000 of first mortgage bonds of said railroad company, to be secured by a deed of trust " on all the works, property, rights, assets, and franchises of the said Richmond and Mecklenburg Railroad Company, as well those which it now owns as those which it may hereafter acquire."

This contract and deed of trust were both made long prior to the delivery of paper " A " by McPhail to the Richmond and Mecklenburg Railroad Company. This contract imposed no prohibition upon the purchase or condemnation by the Richmond and Mecklenburg Railroad Company of rights of way or road-bed, and in fact it had to condemn and pay for some of the lands along the line of its road. Nor did the said deed of trust convey the debts due to the Richmond and Mecklenburg Railroad Company. But as the deed of trust purported to be upon all the assets of the Richmond and Mecklenburg Company, some of the directors thereof declined to execute it until provision was distinctly made for the debts due by the Richmond and Mecklenburg Railroad Company. This was effected by leaving with the said company $10,000 of the said first-mortgage bonds, for the purpose of discharging said indebtedness, which consisted of some $7,000 for commissions due to subscription agents along the line of the road,

and other obligations due by the company to parties who could not give the right of way.

Thus it will be seen that there were not only ample assets of the Richmond and Mecklenburg Company to pay for the right of way through the land of Humphreys out of this $10,000 of its first-mortgage bonds, which, so far as shown by the record, would have been ample; but, in addition, the company held and controlled its subscription-list to its stock, amounting to $87,167, of which $55,744 was to be paid in land, $3,800 in materials, $6,400 in labor, and $21,223 in money. Moreover, the company retained and held the subscription of Humphreys for $1,000, for the balance of which the company sued in its own name and right.

This balance on subscription the company could, with convenience and justice, have applied, so far as it might go, in compensating Humphreys for the right of way through his land. It is, therefore, obvious that there is nothing in McPhail's statement as to the then impecunious condition of the Richmond and Mecklenburg Railroad Company. But it is immaterial what was the then condition of the company. If it took his land and property, and has used and enjoyed it, without rightful authority, it is liable therefor.

Recurring again to McPhail's cross-examination, it is important to call attention to the last question propounded to him by counsel for the plaintiff, the appellant here, on his re-cross-examination, and to his answer, thereto, as follows:

Question. "Are you not now, and have you not continuously been, the president of the Richmond and Mecklenburg Railroad Company since its organization in 1880?"

Answer. "I have. I desire to state further, in acting for Mr. Humphreys, so far as relates to holding the paper, I acted in my individual capacity, and held the paper, so to speak, in escrow."

Here is a purely voluntary statement, not called for by the question put to him, in which McPhail plainly and unequivocally admits all that is claimed by Humphreys.

But the witness is taken in hand by counsel for the railroad company, on whose behalf ·the witness was introduced, and is examined as follows:

First question. "In legal definition 'escrow' means a paper held under conditions not to be delivered until the conditions therein specified had been complied with. Was this such a paper?"

Answer. "The conditions specified in the papers have been complied with by the railroad company, and all other conditions relating to the matter imposed upon me, by writing or otherwise."

Second question. "Was there any understanding between you and Mr. Humphreys that the railroad company had to do anything as a condition precedent to your passing the papers to the company?"

Answer. "None."

Third question. "In answer to a question by plaintiff's counsel, you state that in acting for Mr. Humphreys as relating to holding the papers, you acted in your individual capacity, and held the papers, so to speak, as an escrow. What did you mean by holding it in escrow?"

Answer. In using the words, so to speak, I meant something like, and used them only in reference to the condition referring to compensation, which conditions are not stated in the paper, and which were complied with before the paper passed out of my hands."

Here ends the deposition of Major McPhail. While it contains many inconsistent and irreconcilable statements—due, doubtless, not to any deliberate purpose to misrepresent the facts, but to the want of a retentive memory—yet the deposition, taken altogether, is more in favor of, than opposed to, the claim asserted by Humphreys as to the conditions upon which paper " A " was signed by him, and delivered to McPhail. But independently of the testimony of McPhail, the evidence clearly sustains the contention of Humphreys, which is, that the

paper was not to be used unless the withholding of it would defeat the building of the road, or the board of directors of the Richmond and Mecklenburg Railroad Company should make him compensation. Soon after the execution of paper "A" the arrangement for building the Richmond and Mecklenburg road by the Terminal Company was consummated. Thenceforth the building of the road was assured, and the only remaining duty imposed upon McPhail was to secure compensation to Humphreys, or to return the paper to him. But he admits that he never presented the claim to the board of directors of the Richmond and Mecklenburg Railroad Company, of which he was the president, and that he never even made known the existence of the paper; yet, long after the building of the road was assured, he delivered the paper to Howard, the company's agent, who was fully cognizant of the conditions upon which the paper was signed by Humphreys and delivered to him. Howard's knowledge was the company's knowledge, and the delivery to him was unauthorized, null and void.

These being the facts in the case, it only remains to show that they may, unquestionably, be established by parol. It is undeniably true that to have made the delivery in question a valid delivery to the railroad company it must have been delivered to McPhail, or the agent of the company, "for the use and benefit of the company, and with intent to pass an absolute property or interest in the deed delivered." *Lou. Life Insurance Co.* v. *Cole,* 4th Fla. 359. In Devlin on Deeds, § 316, it is said: "A delivery of a deed, with the intention of passing the title, made to an officer of a corporation, is a delivery to the corporation itself, if it be done for the use and benefit of the corporation. But a deed may be delivered to an officer of a corporation, to take effect as an escrow, upon the performance of a condition, as there is no such personal identity between a corporation and its officers as will prevent a delivery to the latter as an escrow." For this position the author quotes

abundant authority.   See the case just cited and *Bank of Hulds-burg* v. *Bailhauche*, 65 Cal. 326; *Booker* v. *Burdekin*, 11 Mus. & W. 145; *Flagg* v. *Mann*, 2 Sum. 510; *Millenship* v. *Brookes*, 5 Hurl & N. 797.

In the same section Devlin says: " It is not an inevitable conclusion that the mere delivery of manual possession is a valid delivery of the deed.   If the acceptancy of an agency from both parties will involve no violation of duty to either, the releasor may make the agent of the releasee his own agent for the purpose of holding the deed as an escrow, and returning it to him in case a stipulated condition is not performed. The rule that a delivery to an agent of the grantee is equivalent to a delivery to the grantee himself would not apply in such a case, because there is not that personal identity between the releasee and his agent upon which the reason of the rule depends.'' *Cincinnati, Wilmington, &c., R. R. Co.* v. *Iliff*, 13 Ohio St. 235; *O. O. & F. R. R.* v. *Hall*, 1 Bradwell (Ill. R.), 612.

Howard was the agent of the company, charged with the preparation of deeds to rights of way and the obtaining of their execution.   When Howard received the paper, for the purpose of getting a deed, he was fully aware of the conditions on which it had been delivered to McPhail, he having been present when they were agreed upon, and he and McPhail being the attesting witnesses to the paper.   This knowledge on the part of Howard must be attributed to the company of which he was the agent.   *Newlin* v. *Brand*, 6 W. Va. 110.   See, also, *Ward* v. *Chum*, 18 Gratt., at p. 813, where it is said : " If the delivery is upon a condition made known to the obligee, his assent to it will be presumed from the acceptance of the instrument, and he will not be allowed to repudiate the conditions thus assented to and to treat the delivery as absolute and unconditional."   So, too, in *Nash* v. *Fugate*, 32 Gratt. 395, which turned upon an instruction " that a bond, perfect on its face, is invalid in the hands of the obligee if he had notice of the conditions on which it was signed by the defendant."   In that

case this instruction was sustained, and Judge Staples, delivering the unanimous opinion of the court, cites, with approval, among others, the case of *Millett* v. *Parker*, 2 Metc. (Ky. R.) 608. See, also, *Hains* v. *Harriss*, 23 Gratt. 778, and *Newlin* v. *Brand, supra.*

When a deed is delivered to a person to be held until certain conditions are performed, and then to be delivered to the grantee or obligee, it is an escrow; but the person to whom the deed is delivered in the first instance must be the judge as to when the condition is performed, in order to act. His judgment, however, is always subject to review by a court. Devlin on Deeds, § 327. And so, if it is delivered before the condition is performed, equity will declare such delivery void. *Id.* §§ 321, 322; *Hicks* v. *Goode*, 12 Leigh, 490, 491. The depository of an escrow is, in fact, the agent of both parties. As the agent of the grantor it is his business to withhold the deed until the condition is performed; as the agent of the grantee it is his business to hold it for him and to deliver it to him after the condition is performed. Devlin on Deeds, § 327. The duty imposed upon McPhail, in the present case, was to ascertain whether the withholding of paper " A " would prevent the construction of the road. By his own admission he ascertained that it would not. His only remaining duty, then, was to get compensation for Humphreys, and failing this, to return the paper to Humphreys. But he utterly ignored the obligations thus resting upon him; hence his delivery of the paper was without authority, null and void. Devlin on Deeds, § 322; *Hicks* v. *Goode, supra; Nash* v. *Fugate*, 24 Gratt. 208, 209.

We are, therefore, of opinion that, on the facts and the law applicable thereto, the case is clearly with the appellant, Humphreys, and that the court below erred in dissolving the injunction and dismissing the bill.

There is much evidence in the record as to the damage done to the appellant by the railroad company in occupying his land

with its earth-works and masonry, and also as to damages to the residue of his tract of land by reason of said earth-works or embankment. But this court will not invade the legitimate province of a jury by undertaking to ascertain such damages, upon the variant estimates of witnesses, when the object can be better and more safely accomplished by a jury of the vicinage, but will enter a decree here reversing and annulling the decree appealed from, and remanding the cause to said circuit court with instructions to restore the case to its place on the docket, to be proceeded in to a final decree and with a further instruction that, when the case is matured for hearing an issue *quantum damnificatus* be directed, to be tried at the bar of said court, on the law side thereof, to ascertain the damages aforesaid, and that the same when so ascertained and duly certified to the chancery side of said court, be set-off against said judgment at law confessed by the appellant in favor of the said Richmond and Mecklenburg Railroad Company, and that the excess of said damages, if any, over and above said judgment, be decreed against said railroad company in favor of the appellant, Humphreys.

DECREE REVERSED.